Hardwick, Schneider, LLC. On behalf of the appellant, Mr. Richard B. Skelton. On behalf of the appellant, Mr. Robert G. Black. Mr. Skelton, you may proceed. May it please the court. I represent the appellants, Richard and Jerry Skelton. The issue before  us today is a question as to whether Illinois courts have jurisdiction over an out-of-state law firm that allegedly committed malpractice in its representation of Illinois residents. The burden of proof in this case rests on the plaintiff, who must show a prima facie case for jurisdiction over a non-resident defendant. When, as in this case, the trial court decides the issue of personal jurisdiction solely on the basis of documentary evidence, the appellate review is de novo. Of course, any review or consideration of whether there is jurisdiction over a non-resident defendant must refer to the Illinois long-arm statute. In this case, the appellants have alleged jurisdiction under two sections of the long-arm statute and several subsections. Section 209A, which calls for specific jurisdiction, in section 209A2, the commission of the tortious act within the state, A7, the making or performance of any contract or promise substantially connected to the state. Yes, sir. Let me ask you this. Can our disposition be focused on constitutional due process? If there's federal constitutional due process, ergo, there's state federal due process, and if there's due process, then the long-arm statute is more or less complied with. So if you focus on the constitutional argument, I think you can sort of bisect the Illinois long-arm statute. I don't think there's any question, Your Honor, that the whole question is one of due process. In fact, section 209C, which was enacted in 1989, which is referred to as the catch-all provision, was meant to extend the limits of the long-arm statute to be coextensive both with the Illinois state constitution and the United States constitution. And courts in this state, in Costa v. Pincus and Keller v. Henderson in both states, that once federal and state due process requirements have been met, it's not necessary to show that the defendant met any of the specific acts within section 209A. Nonetheless, you still see cases decided based on 209A alone, not with some methods. Method-specific jurisdiction under the statute isn't irrelevant, but it's still very important because there's an entire body of case law that has been dedicated to the specific instances and transactions or acts of defendants that will constitute due process requirements necessary in order for this court to have jurisdiction. So when I look at section 209C, where it states a court may also exert jurisdiction on any other basis that is in addition to those set forth in 209A and 209B, now very aptly permitted by the Illinois constitution and the constitution of the United States, I take that to mean you don't have to necessarily meet one of the acts within 209A or 209B, as long as due process requirements are met, as you suggested. However, it is a catch-all provision, and certainly 209A specific jurisdictional analysis is appropriate. Well, isn't that exactly what Keller, well, not, I won't say exactly, but isn't that what Keller basically finds, that we can look at the issue of due process and not look at all of the other issues? There's no question that both Keller and Costa v. Pincus say that you can go straight to the due process analysis. And all of this comes down to one question, really, what are the due process requirements in order to have jurisdiction over a non-resident defendant? And what are they? Excuse me? And what are they? Okay, well, I mean, those are set forth very particularly in the Burger King case, United States Supreme Court setting Burger King, is you have to have minimum contacts with the state, or the foreign state, in order for there to be jurisdiction. Let's go through the three prongs, and then when you hit each prong, tell us what, how your case satisfies. Okay. With respect to prong number one, whether the defendant had minimum contacts with the foreign state, such that he had fair warning that he may be required to defend himself in that state. In this case, it was the defendants, MHS, who reached out to the residents in Illinois on January 7th of 2007 when they wrote a letter saying, we want to represent you in your purchase of property in North Carolina. This was the first time that the residents of Illinois had ever heard of MHS, of the defendants. And the point I'm trying to make here is that it was the defendants who solicited the plaintiffs for the position as their attorney, and not the other way around. Who sent the copy of the contract on the property, or who prepared it, to your knowledge? I can't say who prepared it, but it was sent by the defendants. So that was the first contact with the defendant was not them asking to represent. Well, at the time the contract was sent, back in November of 2007, MHS purportedly represented the seller. Correct. There's absolutely no idea on behalf of the purchasers that they would be representing them. So it wasn't until January 7th of 2007 when MHS wrote them a letter saying, we will represent you in this transaction. So that's when they reached out to you specifically. Exactly. And in the letter they say, we will represent you to the extent of assuring that you acquire a good and marketable title to the property, and we can advise you on legal questions concerning the title, the title insurance, and covenants and conditions with respect to the loan documents. At that point, and I think we should maybe step aside back for just one second, it's an interesting process of how MHS came to make contact with the plaintiffs in Illinois. Apparently they had a deal with the seller in North Carolina. When the seller sold a piece of property in this particular development, they would then contact MHS and say, there's a buyer here. Do you want to represent him? If so, contact him and offer your services. In fact, MHS admitted that they, during a one-year period, that they had received 24 referrals from the seller of the development to the plaintiffs in this case. Were they effectively represented both sides at one time or another? I think that's undeniable. And there were no questions asked about this particular arrangement? Well, on our part, I can say that there were not. Certainly it does raise questions as to the extent of what their involvement is, and I believe those are issues actually that should be raised during the trial of this case. And in the complaint, one of the allegations is that they committed malpractice by virtue of the fact that they had a conflict of interest by virtue of representing both the seller and the buyer in the same transaction. And the lender. Did they represent the lender too? Yes, they did. Aside from reaching out then and offering to provide their services, and I would say that they're really wearing, you know, not only the hats of the attorneys for the seller, the lender, and the buyer, but they're also wearing a separate hat with separate obligations, and that is that they were the agent for the title company. They researched the title. Let's not go into the malpractice issue. Let's stick with your three prongs where we were going. Okay. I'm sorry. Okay. So they So a minimum contact. Right. They contacted the plaintiffs originally in November again in January 7th. At that point in time, they contacted the plaintiffs by telephone on several occasions and also sent correspondence to the plaintiffs, including all of the documents that you would normally see in a closing. So they prepared the warranty fee, the trustee, the notes, the mortgage, the HUD-1. All the documents that you would typically see in a closing were at various times sent by correspondence from the defendants to the plaintiffs in Illinois where they were advised, either by telephone or written instructions, to sign these documents and to send them back, in which case the plaintiffs would send the documents back. So if you look at the transactions on both sides of the correspondence, you'd come up with ten different sets of correspondence between the plaintiffs and the defendants, initiated in each case by the defendants sending the plaintiffs documents. So essentially that is the context, the context of the offer to represent the performance of the legal obligations that they agreed to provide and the correspondence and telephone contacts between the parties. All right. What about the second one, the action must have arisen or be related to the defendant's contacts with the foreign state? Right. Well, the malpractice action essentially alleges that the performance of the duties by the defendants in this case was both improper, negligent in breach of fiduciary duty and a breach of the contract and the warranty provisions that they provided in the letter of January 7th, as well as, you know, the warranties that they would be providing as the agent for the title insurer at the very same time. So in failing to discover various encumbrances that were upon the property, they committed malpractice allegedly. And that malpractice arose from the representation of the plaintiffs in the case, their preparation of a title commitment that failed to raise those particular objections. So it certainly arose out of the context and during the representation. Now, they're going to say that it arose out of the purchase of some property in North Carolina. And what's your specific response to that? Well, I find that argument baffling. It's they're basically saying that they were lured into this transaction by virtue of the fact that the plaintiffs went to North Carolina to buy property. But the plaintiffs didn't go to North Carolina in order to establish an attorney-client relationship. In fact, that was nowhere on their minds. They simply wanted to buy some property. So by analogy, if the plaintiffs had come back to Illinois and said, we're going to hire an Illinois attorney to represent us in this transaction, would the case have to be heard in North Carolina because an Illinois attorney was hired to represent them in the North Carolina purchase? And it really doesn't make any sense. Well, what if the lender or somebody on the other end in North Carolina felt that they were deceived or had a case against the attorney from Illinois? Wouldn't the same argument be made in North Carolina? No, I believe they could sue the attorney in Illinois, certainly, or they could raise the issue again in North Carolina, but then the minimum context issue would arise again. I can take it one step further. MHS has offices in 14 states. They represent buyers and sellers in all of those states. Their principal place of business is Georgia. So even though the property is located in North Carolina, if the plaintiffs had decided to sue them at their principal place of business in Georgia, would their objection be, you can't do that because the property is located in North Carolina? Again, that argument doesn't really make sense. Beyond that, and I think this is an error on the trial court's part, the trial court said the subject matter of this case is the property in North Carolina. But that's not really the issue. The issue is the quality and nature of the representation of the defendants as attorneys in a malpractice action. It's not an interim case, so it doesn't pertain to the property per se. It pertains to the nature of their representation. The third requirement, whether it is reasonable to require the defendant to litigate in the foreign state. Now, the trial court basically ruled that it did not think that it was reasonable to litigate here because the property was located in North Carolina. But that really entails the arguments that we just discussed, that it's not where the property is located, it's where the harm or the damages occurred. And in particular, with respect to the tortious act that had been alleged. In the Cullata v. Healy case, the court held that the jurisdiction requirement is satisfied if the defendant performs an act or omission that causes an injury in Illinois and the plaintiff alleges that the act was tortious in nature. In the Healy case, the court said the defendant made telephone calls to plaintiff in Illinois, mailed bank documents to plaintiff in Illinois, the money was sent from Illinois, and the injury suffered by plaintiff occurred in Illinois. And that's basically the position of the plaintiffs in this case. Now, the defendants have argued that it's not reasonable to litigate here. But looking at Burger King and the cases in Illinois that have discussed that particular requirement, several things must be considered. First, one, the state of Illinois has a manifest interest in protecting its residents in a convenient form. That's from Burger King. Two, where individuals purportedly derive a benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other states for the consequences that arise approximately from their actions. Again, that's the case here. The defendants did benefit. They were paid for the services that they provided. Three, because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity, it usually will not be unfair to subject him to the charges. Now, that's 1985 that the Burger King decision was decided. Certainly modern business practices over the last 25 years have certainly engaged, encompassed more and more interstate activity between parties, particularly with the Internet, et cetera. Is Illinois one of the 14 states where they actually have offices? No, it's not. The fourth reason, and this was set forth in the I'll finish my final statement, that in Orris v. Kennedy, the court, with respect to whether it's reasonable to have him litigate in the state, said the defendant has the burden of demonstrating compelling reasons why it should not have to litigate in the forum where it had the minimum contact. So in this case, there were no reasons why it should not have to litigate. Thank you. Thank you. Morning, Your Honors. My name is Robert G. Black, and I represent the defendant in this matter. May it please the court? Mr. Black, because I have a short attention span some days, tell me why the trial court and why you distinguish this case from Orris v. Kennedy. Why do you think this case is so different? And maybe that will help me understand why the trial court did. Certainly. Orris v. Kennedy involved a series of representation and acts of representation far in excess of this matter and far more substantial than this matter. Well, there were far more substantial dollar values, but is that, I mean, that's partisan, but I don't think that's what the court in Kennedy decided to do. No, I don't believe that that's what we've been asserting or what the trial court asserted. It is true that in Orris, I think that the estate issue was worth $1.5 million. What we've got here is a $400 closing fee and no real indication of what the lot is worth or not worth. But in Orris v. Kennedy, the person who had died, the decedent, had moved to Texas, that a Illinois law firm did give certain legal advice to her in terms of her estate planning. And in doing so, they also relied upon and conferred with a Texas attorney over a series of numerous months, I believe in excess of a year, and that there were substantial and ongoing discussions between the two of them, between the Illinois law firm and the Texas attorney, resulting in the estate plan. After the decedent passed away, and I believe it was an airplane crash, the decedent's estate sued the Illinois law firm for negligent advice which had a serious and negative impact upon her estate planning. The Illinois law firm in turn then filed a contribution action against the Texas attorney. And what the court stated in Orris is that the record showed, the documentation showed a series of conferences back and forth, reliance upon the Texas attorney for certain aspects of things. The Texas attorney talking to Illinois counsel about various aspects in terms of formulating the final estate plan. And the Illinois court saying it's reasonable for him to litigate here because this is essentially a contribution action. It was already begun in Illinois against the Illinois attorney. The Texas attorney had substantial contacts with the Illinois attorney in terms of giving the advice and consulting and confab with the Illinois attorney. So I think that that idea of the fact that it's a contribution action, a case pending, so it makes sense to bring it in. But even though we have big dollars here and maybe smaller dollars, we don't know for sure. We've got contacts, we've got communication back and forth. The documents are drafted and sent here. It essentially closes the transaction just as what happened in the estate, in the Orris case. So other than the fact that it's a contribution action, what's the difference? I believe that the fact that that's a contribution act is a distinction. It is not the distinction and perhaps not the critical distinction. I believe that the fact that it was a contribution act probably fits in within the third prong of the analysis more than anything else. But it's not the only thing here. What otherwise distinguishes this case is that, yes, we have documents sent to Illinois for a mail-only closing. We have some indicia of telephone conferences or telephone phone calls, but no idea of when they occurred, who initiated them, what they were about, anything like that. It's very conclusory and I would assert that under Rule 191, those assertions by way of an affidavit don't really hold water. But then you have here the other distinguishing factors are that the analysis of the closing documents and everything else that has been alleged in a personal services setting took place outside of Illinois. That the review concerning the allegations of whether this is a good and marketable title all occurred outside of Illinois. They were done in North Carolina. They were construed ostensibly in North Carolina. Maybe they were done in Georgia for all we know. Maybe they were done in Georgia for all we know. They weren't done in Illinois, but the actual closing involving the North Carolina property were by attorneys that have an office in North Carolina, are licensed to practice in North Carolina, do not have an office in Illinois, are not licensed to practice in Illinois. How's this case, you distinguished the Texas case. How's the state case different than the Cullata case? I mean, what more contacts did they have there than you do here? The Cullata case, I've drawn a blank on that one. I'm recalling that the Cullata case had, again, substantially more contacts and more reason why the defendant there purposely availed himself of Illinois than this matter. Your Honor, I'm not trying to make light of That was telephone and mail, and I understand what you're saying. We don't know how much telephone, how much mail contact, but I think that that case basically is for the proposition that telephone contact, mail contact is sufficient to constitute minimum contact. I believe it can be sufficient, and there's also a case law that says even the mere entry of a contract can be insufficient. What we know about this case is that the plaintiff was contacted by a third party. Hey, there's some property in North Carolina I want you to take a look at. The plaintiff went out to North Carolina and looked at the property. He put $5,000 on the property. As a result of that, he received some money for that purchase agreement and for an additional escrow deposit. Moving from there, the documents were signed by the plaintiffs in Illinois, forwarded to Georgia or North Carolina. I'm not recalling which one it was, and completed, I believe, in North Carolina. After that, the documentation, there was a further package of case here in that closing agreement, which encloses documentation for the plaintiffs to sign and send back for what's called a mail-away closing. That says basically that we represent the buyer to the extent of ensuring that you acquire a good and remarkable title to the property. That's where they reached out, so to speak, to the individuals in Illinois, correct? Well, that is plaintiff's view, and I certainly understand that. When we look back to the cases that talk about the different prongs here, and the second prong being looking at cause and effect and legal cause and foreseeability, this is something that was sent to them that said, you know, to the extent of ensuring that you acquire a good and remarkable title. Good and remarkable title is nowhere defined in this document. And it then has a reservation, so to speak, or a limitation that, however, we can advise the buyer only on legal questions concerning title to the property, title insurance, and the covenants and conditions of their loan documentation. And then it discloses they're also representing the lender, and then it contains the further language in boldface, and this is at page 23 of the record, that in the event of a dispute between buyer and lender, we're not going to represent anybody, essentially. But that's the full extent of what we know about what was directed to an Illinois resident. Doesn't the Collada case more or less hold that if you purposely direct your activities to the foreign state, that meets the requirement in the context? I believe that that's the general statement in Collada. I believe, however, that the... Did the defendant in this case purposely direct its activities to state Illinois? I believe that the defendant, and again, within the three-pronged analysis, was directed to plaintiff's interest in the property, was directed to send the closing documents to the plaintiffs. This was a contract that they sent, an agreement between our Illinois residents and their law firm. According to the record, the Illinois residents signed the document. The NHS may never have signed that document that the plaintiffs have seen. But the fact remains, I didn't get a request to, you know, I didn't get a copy of the contract. I don't know if you did, but apparently the Skelton's did after they looked at this property. So didn't somebody reach out and say, I can represent you there? I think that they received this particularly because the plaintiffs reached out to look at this property. But they didn't reach out to an attorney to look at the property. It's quite clear that it was a friend and then a real estate developer. The attorney never surfaced until the contract to purchase the property was actually mailed, correct? Yes, there was the contract to purchase the property and then the closing documents, that's correct. And a contract in the interim that said, we can represent you on these issues, these specific issues. Specific issues, correct. How would it not be reasonable, Mr. Black, to require the defendants to litigate in Illinois? Well, I think that as the Trump court recognized, should this case proceed, you're talking about documentation in North Carolina, analysis under North Carolina of all witnesses that are in North Carolina and Georgia. All of those things make it very inconvenient for the defendant to be forced to litigate this case in Illinois. Basically what you have here are the plaintiffs and you have the fact that they received the documentation and sent it back, but everything else concerning what's a good marketable title, what does that mean, is going to have to be analyzed in reference to their review of the law there, their review of the closing documents there. Everything else necessary to decide this case is in another state. And if it was inconvenient, if they presumed it would be inconvenient and they sent the contract for representation to Illinois to the plaintiffs, why wasn't there a disclaimer that all matters will be any litigation? Well, they did say we won't represent either one of you if there's a problem. They could have easily have said, and if there is a problem, this will be litigated in North Carolina. They didn't do that, did they? They did not. That's not a part of that agreement. I noticed that there was some language to that effect in the original contract agreement, but in terms of the closing agreement, there was not. That brings us to the second prong, and that is the action arising from. Now, a plaintiff says that the action they're bringing is a malpractice action, and yes, they purchased some property, but it's not dependent upon that property. It's dependent upon the representation that came as a result of that property. I know you have a different position, and maybe you can explain it to me. Well, I think the cogent inquiry there is where the damages occur. They're talking about here basically that they didn't get the value that they thought they were going to get on property in North Carolina. We're talking about a personal services issue where the personal services were basically rendered, or they were rendered, out of state. In terms of the analysis that has been generated in terms of cause and effect, legal cause, foreseeability, all the types of things, all the damages, all the things that were allegedly not done in terms of return and in terms of the purported loss of value of the property, all come out of how things were analyzed and looked at and whether they were or were not viewed properly out there in North Carolina in terms of the North Carolina property. I don't think it's that basic, as counsel indicated, the trial court said, because the property is in North Carolina, this is the raise in North Carolina, that's that. I think the trial court properly analyzes to say in terms of the overall factors, in terms of what the allegations are and where the allegations go to and where the damages occur, that the fact that the review was done out of state, it was done concerning what's good and marketable title ostensibly out of state, those are all factors that have nothing to do with El Moine. So it's the nature of the litigation. Pardon me? It's the nature of the litigation. Correct. And you have to, you know, looking at these allegations, Your Honor, I'm going to raise a point that I'm hesitant to raise, but it is something that has troubled me as I've looked at this case in terms of what's good and marketable title here. And it gnawed at me a little bit when doing our briefing. It gnawed at me a little bit more when I read the plaintiff's reply brief and their case law. And it gnawed at me even more when I'm preparing for oral argument. And again, I vacillated over how much I want to talk about this, this morning. But there is a case that they cited in the reply brief, and that's the Kahn v. Van Remen case at 325 L.F. 3rd, 49, and specifically page 60 that says, as defendants point out, a court may make a pro preliminary inquiry into whether the complaint states a cause of action against the defendant who contests jurisdiction to ensure that the actual omissions that form the basis of a cause of action that is pending without merit will not serve to confer jurisdiction. Your time is up, but please. Good and marketable title. What does that mean? They're saying that the value by way of this recorded easement, and I would stress that it's a recorded easement, is much less to us. Because of the burn. They still have good title. They still have marketable title. I think that, well, and I know that Justice Bowman wants to move on, but I think that's an issue that will have to be addressed at trial. It may be a really big hurdle if it ever gets to that point. But the issue today is, do we have jurisdiction? Your Honor, quite frankly, that's what I believed all along in the briefing. But after reading this case and seeing that type of language, and it's a second district case, I started to think about it some more. Thank you. Thank you, Your Honor. We would therefore ask that the judgment of the circuit court be affirmed. What is your response to Mr. Black concerning the nature of the context? All of the issues that you are concerning yourself with are issues that really occurred in North Carolina with respect to the property. And that's exactly what Golden said in Orris v. Kennedy. He was the attorney in Texas, and he said, I'm not licensed to practice in Illinois. I've never been in Illinois to talk to Orris or anybody else about this case. And I saw the work I performed in this case was done in Texas. The telephone conferences that took place were between myself and Orris, you know, that I made from Texas. And I was essentially representing a probate action. At their request, they contacted him while he was in Texas. And so the very same argument that the defendants are raising here are the very same arguments that were raised by dying in Orris, and yet Orris found there was jurisdiction. But there was one other issue, and that's pointed out by Mr. Black, that there was already the legal malpractice pending in the state of Illinois. The decedent's widow filed here. And it doesn't make sense in all sorts of forums to have one litigation in Texas, one in Illinois. So we do have a reason to be here already. We don't have that in your case. Is that what distinguishes the case? Is that what the trial judge distinguished? Well, I mean, if I was in Mr. Black's position, I'd be raising the fact that there was a contribution claim, you know, that arose in the Orris case as well. But by the time the Orris court got to the contribution claim, they'd already established that there were minimum contacts. They'd already established that the contacts were the basis for the causes of action that arose. And they said, you know, in addition, there is a contribution case. But they went on to say the defendant would have to show a compelling reason why they shouldn't be allowed or be forced to litigate here. And then they cited all the Burger King precedent that I set forth before. I'd also point out that in Cullata, there's no contribution claim there, and the contacts are even much less than they are in this case and in the Orris v. Kennedy case. And the court in Cullata went on to say it will be a rare circumstance where a defendant will be able to show compelling evidence why it's not reasonable to litigate in this state after they've held themselves out to residents of this state and derived a benefit from their representation. Do we have evidence in this record thus far that the actual reach-out came to Richard D. and Jerry B. Skelton, or did it just come to the resident act? Is there evidence of that nature in the record? As to whether the January 7th correspondence came from them, it's in the affidavits of Richard Skelton, and it's never been denied on behalf of the defendant. So I believe that stands as... So it wasn't a bulk mailing. It wasn't a specific, as Justice Bowman used, it's been attached to the court record, and it has a letterhead on the top of it, MHS, and it's directed directly to the plaintiff. And as I understand it, the title condemnment did not list the easement. That's correct. And that's the focal point of the negligence? Yes, it is, Your Honor. What happened if the title company brought suit a declaratory judgment in North Carolina regarding whether it was or was not, and if that weren't a primary issue that affected the malpractice aspect? Right. Hypothetically, what about the assuming if it weren't a title defect, what about the value of the property? With the 60-foot burn, I think reasonably it would affect the value of the property as the plaintiff subjectively viewed it. There's no indication at all while they were there or in any of the documents they received that there'd be a big burn. Is that element alone sufficient to allow the case to be brought in Illinois irrespective of whether or not a title failure to list the easement would be a failure to the plaintiff finding it would be malpractice? Right. The issue here is that the attorneys were basically guaranteeing that they were going to provide free and clear title. Now, an easement is an encumbrance on title, and that's black-letter law. Here we have an easement that was placed on the property that doesn't show up on the title commitment and the plaintiffs were not made aware of. And the very nature of it, no one denies the fact that there's a 60-foot burn on this property now, and a question of damages is simply for an appraiser to come in, and they don't have to be in North Carolina to do that. But isn't the North Carolina law with respect to the title, etc., going to be applicable? Well, it's not applicable in terms of any of the agreements that have been signed. It's a Chicago title commitment, and Chicago title commitments and title law in general is pretty much pervasive throughout the states. And I may add one more thing, if I may. It's not like Illinois courts don't ever undertake to review cases based on law outside of Illinois. I mean, if there's a forum clause in the case that says it must be considered here and there's still jurisdiction in Illinois, you consider the law in the laws of North Carolina. I don't believe that's the case. We don't have that in this case, however. I don't believe that's the case. Thank you.